IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



**FILED**

MAY 2 0 2016

Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| MARY ANN MURRAY and LIGE M. MURRAY,<br><br>          Plaintiffs,<br><br>   v.<br><br>BILLINGS GARFIELD LAND COMPANY, ROBERT E. SEVERSON, SEVERSON MINERALS, LLC, BEJ MINERALS, LLC, RTWF, LLC and JOHN DOES 1-10,<br><br>          Defendants. | CV 14-106-BLG-SPW<br><br><br>OPINION and ORDER |
| BEJ MINERALS, LLC, RTWF, LLC<br><br>          Counter-Claimants,<br><br>   v.<br><br>MARY ANN MURRAY and LIGE M. MURRAY,<br><br>          Counter-Defendants. | |

Before the Court are competing summary judgment motions filed by

Plaintiffs/Counter-Defendants Mary Ann Murray and Lige E. Murray (collectively

the "Murrays") and Defendants/Counter-Claimants BEJ Minerals, LLC and

RTWF, LLC (collectively the "Seversons"). The motions present the question of

whether dinosaur fossils found on a ranch are included in the surface estate or the

mineral estate. For the reasons that follow, the Court finds that fossils are not

included in the ordinary definition of "mineral." Accordingly, the Court

1

determines that the dinosaur fossils found on the ranch are part of the surface estate.

## I. Background[1]

### A. Factual Background

George Severson formerly owned a large amount of farm and ranch property located in Garfield County, Montana. (Doc. 33 at 3.) Beginning in 1983, the Murrays leased the land from George Severson and worked there as ranchers. (*Mary Ann Murray Depo. 30:3-31:8*, Doc. 48-4 at 5-6.) Over the years, George Severson transferred portions of his interests in the property to his sons Jerry and Robert Severson and sold the other portions of his property interests to the Murrays. (Doc. 33 at 3.) From approximately 1991 through mid-2005, the Murrays operated the property in partnership with Jerry and Robert Severson under the name Murray Severson Ranch Partnership. (*Id.* at 4.)

In 2005, Jerry and Robert Severson (and/or entities they owned and managed) sold their surface ownership rights in the property to the Murrays. (*Id.*) At the time of the 2005 sale, the mineral estate was severed from the surface estate. (*Id.*) The purchase agreement provided that at closing, the parties would execute a mineral deed apportioning ownership of the mineral rights as follows: 1/3 to Robert Severson, 1/3 to Jerry Severson's company Severson Minerals, LLC, and

---

[1] Unless otherwise noted, these facts are undisputed.

1/6 each to Lige and Mary Ann Murray. (*Id.*) One exception was a parcel where half the mineral rights were owned by an unrelated third party known as the Billings Garfield Land Company. (*Id.* at 5.) On that parcel, ownership of the mineral rights was apportioned as follows: 50% to Billings Garfield Land Company, 16.67% to Robert E. Severson, 16.67% to Severson Minerals, LLC, and 16.67% to the Murrays. (*Id.*)

The mineral deed provided that the Seversons and the Murrays would own as tenants in common "all right title and interest in and to all of the oil, gas, hydrocarbons, and minerals in, on and under, and that may be produced from the [property]." (*Id.* at 6.) The parties executed and recorded the deed in connection with the sale of the surface estate. (*Id.* at 4.) At the time of the sale, neither the Seversons nor the Murrays suspected that dinosaur fossils existed on the property. (Doc. 55 at 6.) Robert Severson's interest is now held by BEJ Minerals, LLC. (Doc. 33 at 5.) Severson Minerals, LLC's interest is now held by RTWF LLC. (*Id.* at 4.) To avoid being involved in this lawsuit, Billings Garfield Land Company has subsequently transferred to the Seversons any interest it had in any fossils found on the property. (Doc. 53 at 8.)

After the severance of the mineral and surface estates, the Murrays discovered several dinosaur fossils on the property. The first fossil was a "spike

3

cluster" from a Pachycephalosaur found in the fall of 2005. (Doc. 53 at 12.) At the time, the Murrays did not consider this fossil to be significant. (*Id.*)

Sometime prior to December 2006, the Murrays discovered fossils of two separate dinosaurs that appear to have been locked in battle when they died. (Doc. 53 at 12, 14-15.) Subsequently nicknamed the Dueling Dinosaurs, one of the Murrays' experts described it as a "one-a-kind find." (*Peter Larson Depo. 131:10*, Doc. 48-4 at 141.) Fossils of dinosaurs that appear to have interacted are rare, and the Dueling Dinosaurs "have huge scientific value." (*Phillip Manning Depo. 120:11-25*, Doc. 48-4 at 185). An appraiser concluded that the Dueling Dinosaurs have a market value of between $7 million and $9 million. (Doc. 55 at 17.) The Murrays attempted to sell the Dueling Dinosaurs at a New York City auction, but nobody bid over the reserve of $6 million. (Doc. 55 at 17; *Mary Ann Murray Aff.* ¶ *3*, Doc. 55-2 at 2.)

The Murrays also discovered the fossilized remains of a Tyrannosaurus rex on the property. (Doc. 55 at 7-8.) Subsequently nicknamed the "Murray T. Rex," there are only about a dozen Tyrannosaurus rex skeletons as well preserved and complete as the Murray T. Rex. (*Id.* at 18.) The Murray T. Rex has been sold to a Dutch museum for a negotiated price in the millions of dollars. (*Id.*) The proceeds from the sale are being held in escrow pending the outcome of this action. (*Id.* at 8.)

A Triceratops skull and part of a Triceratops foot have also been found on the property. (Doc. 33 at 6.) The Murrays' agent who helped prepare the Triceratops skull for display wrote that it was "the best specimen I have ever worked on and i [*sic*] have done 27 Triceratops skulls." (*Chris Morrow Email*, Doc 48-6 at 27.) Clayton Phipps, who helped the Murrays locate and excavate the fossils found on the property, described the skull to a potential purchaser as "one of the best if not the best Triceratops skull ever found and the best one available for sale now.[2]" (*Clayton Phipps Email*, Doc. 48-6 at 23.) The Murrays have offered to sell the Triceratops skull for between $200,000 and $250,000. (Doc. 55 at 20.) They sold the Triceratops foot by itself for $20,000. (*Id.* at 21.)

The Murrays entered into contracts and arrangements with third parties relating to the excavation and sale of the fossils found on the property. (*Id.* at 10.) The Murrays did not notify the Seversons upon discovery of the fossils or before attempting to sell the fossils. (*Id.*) The parties agree that the Dueling Dinosaurs, the Murray T-Rex, and the Triceratops fossils are rare, exceptional, and have special value. (*Id.* at 18, 19, and 21.)

---

[2] The Court notes that both the Morrow and Phipps emails were to potential buyers, so there is a chance that the superlatives were puffery.

## B. General Information about Fossils

The parties' experts differ slightly in describing the process of how the dinosaur bones found on the property became "fossilized." The Seversons' expert Raymond Rogers described fossilization "as a preservational process." (*Raymond Rogers Depo. 89:9-10*, Doc. 48-4 at 234.) Bones and teeth naturally contain a mineral called hydroxylapatite. (*Raymond Rogers Ex. Disclosure at 6*, Doc. 48-4 at 199.) In the vast majority of instances after a vertebrate's death, the bones are decomposed and destroyed. (*Id. at 7*, Doc. 48-4 at 200.) However, in some circumstances, the bones and teeth can be stabilized and fossilized after a material called collagen is removed. (*Id.*) Rogers opined that fossilization refers to the "recrystallization" of organic bone matter into more stable forms. (*Id.*) Further, minerals are sometimes added to the bone by filling preexisting open spaces in the bone structure and the space formerly occupied by decomposed collagen. (*Id.*) Such minerals include calcite, pyrite, barite, apatite, chlorite, and silica. (*Id.*) However, minerals do not fill voids in all fossils. (*Id. at 8*, Doc. 48-4 at 201.)

In reviewing the dinosaur fossils found on the Murrays' ranch, Rogers concluded that the dinosaur bones recrystallized into a compound called francolite. (*Id. at 10*, Doc. 48-4 at 203.) According to Rogers, "[f]rancolite is a carbonate and fluorine enriched apatite group mineral." (*Id. at 9*, Doc. 48-4 at 202.) Rogers stated that francolite is the most common mineral found in recrystallized fossil

bone. (*Id. at 8-9*, Doc. 48-4 at 201-02.) Rogers reviewed x-ray diffractograms performed on the fossils found on the property, and he concluded that francolite is present in the fossils. (*Id. at 9-10*, Doc. 48-4 at 202-03.) Rogers opined "that the fossil dinosaur bones in question were recrystallized to the mineral francolite during fossilization." (*Id. at 10*, Doc. 48-4 at 203.)

The Murrays' experts largely agree with the fossilization process described by Rogers, but they differ on the conclusion that francolite is a mineral compound. Expert Peter Larson opined that "francolite has not been recognized as a distinct, valid mineral species since 2008." (*Peter Larson Rebuttal Ex. Report at 1*, Doc. 55-6 at 6.) Larson stated that the fossils are composed of the mineral hydroxylapatite. (*Peter Larson Depo. 223:12-14*, Doc. 48-4 at 156.) As mentioned above, hyrdoxylapatite is not unique to fossils, as it is found in the bones of living vertebrates. Larson compared the x-ray diffraction patterns of the Murray T. Rex and a modern bison bone, and he concluded that the samples contained identical patterns of hydroxylapatite. (*Id. at 219:17-221:17*, Doc. 48-4 at 219-221.) Larson opined that the fossil "has not been replaced by minerals in any way, shape, or form. It is hydroxylapatite just as when it was alive." (*Id. at 224:15-18*, Doc. 55-3 at 7.) Larson does not consider minerals that fill voids in the bone to be part of the fossil. (*Id.*)

7

While the Dueling Dinosaurs, the Murray T. Rex, and Triceratops skull and foot are indisputably valuable, not all dinosaur fossils are rare and valuable. (Doc. 53 at 16-17.) Fragments of fossils that have little or no value are sometimes referred to as "chunkosaur" or "junkasaur." (*Id.*) Clayton Phipps stated that he has "walked by literally truckloads of bone fragments which [he] regularly call[s] 'leaverite' which means 'leave 'er rite there, it's worthless.'" (*Clayton Phipps Aff.* ¶ 4, Doc. 47-9 at 2.) Finding valuable fossils is mostly a matter of luck and effort, and locating fossils involves walking, riding, or driving around to see if there are any bones lying around or sticking out of the ground. (Doc. 53 at 19.)

## C. Procedural Posture

The Murrays filed this action in Montana state court seeking a declaratory judgment that the fossils found on the property are part of the surface estate and therefore solely owned by the Murrays. (Doc. 1-1.) The Seversons removed the action to this Court on the basis of diversity jurisdiction. (Doc. 1.) The Seversons include a counterclaim for a declaratory judgment that the fossils are properly classified as minerals under Montana law for purposes of a mineral deed. (Doc. 7 at 18-19.) The Murrays and the Seversons now move for summary judgment on their claims.

## II. Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. Since the Court is sitting in diversity jurisdiction, Montana substantive law applies. *In re Exxon Valdez*, 484 F.3d 1098, 1100 (9th Cir. 2007).

## III. Analysis

The Seversons argue that the undisputed facts show that the fossils at issue are composed of minerals. The Seversons note that even crediting the Murrays' expert's opinion, the fossils are composed of the mineral hydroxylapatite. The Seversons continue that the fossils are "rare and exceptional in character" and possess "special value," and are therefore properly classified as "minerals" for purposes of a mineral deed under Montana law. The Murrays argue that the

ordinary and natural meaning of "mineral" does not include fossils. The Murrays

point to statutory and regulatory definitions of "mineral" in other contexts to

support their argument. The Murrays also argue that public policy supports a

finding that fossils are not "minerals" under a mineral deed.

## A. Ordinary and Natural Meaning Test

As mentioned above, the mineral deed provides joint ownership of "all of

the oil, gas, hydrocarbons, and *minerals*" found on the property. (Doc. 33 at 6

(emphasis added).) When used in a deed, the "term 'mineral' has been the source

of considerable confusion in mineral law litigation nationwide." *Farley v. Booth

Bros. Land & Livestock Co.*, 890 P.2d 377, 379 (Mont. 1995). This confusion has

led to "title uncertainty and the need to litigate each general reservation of minerals

to determine which minerals it encompasses." *Id.* (quoting *Miller Land & Mineral

Co. v. State Highway Comm'n of Wyoming*, 757 P.2d 1001, 1002 (Wyo. 1988)).

In *Farley*, the Montana Supreme Court considered whether scoria is a

"mineral" for purposes of land transfers without the benefit of established Montana

law on the topic. 890 P.2d at 379. The Court first examined statutory definitions

of the term "mineral" and found that the definition differs depending on the context

in which it is used. *Id.* For example, scoria was explicitly included in the

definition of "mineral" under Mont. Code Ann. § 82-4-403(6), which is included in

a part of the code entitled Opencut Mining Reclamation.[3] *Farley*, 890 P.2d at 379. Conversely, scoria may not have been included in the definition of "mineral" formerly found at § 82-4-303(9), which was included in a part of the code entitled Metal Mine Reclamation.[4] *Id.*

In the absence of an applicable statutory definition, the Court examined case law from other jurisdictions. *Id.* at 379-80. The Court favorably quoted a North Dakota case which held that "materials like gravel, clay and scoria are not ordinarily classified as minerals because they are not exceptionally rare and valuable." *Id.* at 380 (quoting *Hovden v. Lind*, 301 N.W.2d 374, 378 (N.D. 1981)). The Court also favorably quoted an Oklahoma case which held "that substances such as sand, gravel and limestone are not minerals within the ordinary and natural meaning of the word unless they are rare and exceptional in character or possess a peculiar property giving them special value." *Farley*, 890 P.2d at 380 (quoting *Holland v. Dolese Co.*, 540 P.2d 549, 550 (Okla. 1975)). Finally, the Court also favorably cited *Miller*, where the Wyoming Supreme Court concluded that gravel was not a mineral. *Farley*, 890 P.2d at 380 (citing *Miller*, 757 P.2d at 1004). The cases cited by the Montana Supreme Court followed a test commonly known as the "ordinary and natural meaning test" first articulated by the Supreme Court of

---

[3] In 1999, the Montana legislature changed the defined term found at § 82-4-403(6) from "minerals" to "materials." H.B. 183, 1999 Reg. Sess. (Mont. 1999).
[4] This definition of "mineral" is now found at § 82-4-303(16).

11

Texas in *Heinatz v. Allen*, 217 S.W.2d 994, 997 (1949). Numerous courts follow this approach. *Miller*, 757 P.2d at 1004.

In *Heinatz*, the Court considered whether limestone is a "mineral." 217 S.W.2d at 995. The Court noted that scientific or technical definitions of a "mineral" are not helpful, as "it is rare, if ever, that mineral is intended in the scientific or geological sense in the ordinary trading transactions about which deeds and contracts are made." *Id.* at 997. The Court determined that the term "mineral" should be interpreted according to its "ordinary and natural meaning." *Id.* Under this approach, "mineral" is defined according to "its ordinary and natural meaning unless there is a clear indication that [it is] intended to have a more or a less extended signification." *Id.* Applying that definition, the Court held that:

> [S]ubstances such as sand, gravel and limestone are not minerals within the ordinary and natural meaning of the word unless they are rare and exceptional in character or possess a peculiar property giving them special value, as for example sand that is valuable for making glass and limestone of such quality that it may profitably be manufactured into cement. Such substances, when they are useful only for building and road-making purposes, are not regarded as minerals in the ordinary and generally accepted meaning of the word.

*Id.* Since the limestone at issue in *Heinatz* was only useful for building purposes, it was not a mineral for purposes of a mineral deed. *Id.*

After reviewing these persuasive authorities, the Montana Supreme Court held that scoria is not a mineral. *Farley*, 890 P.2d at 380. Scoria is used in road

12

construction, which did not "elevate scoria to the status of a compound which is 'rare and exceptional in character' and therefore, a 'mineral.'" *Id.* (quoting *Holland,* 540 P.2d at 550–551). Since scoria does not possess any special properties to make it rare and exceptional, scoria was not included in the mineral estate. *Farley*, 890 P.2d at 381.

The Montana Supreme Court later reaffirmed this approach by holding that sandstone is not a mineral included in a general reservation of mineral rights. *Hart v. Craig*, 216 P.3d 197 (Mont. 2009). The Court noted that *Farley* followed the reasoning articled in *Heinatz*. *Hart*, 216 P.3d at 198. However, rather than focusing on the "ordinary and natural meaning" of "mineral," the Court concluded that sandstone is not a mineral because it "is not exceptionally rare and valuable." *Id.*

### B. Application of the Test to Dinosaur Fossils

At least two takeaways from the *Heinatz* test are relevant here. First, the focus of the test articulated by *Heinatz* does not turn on whether the substance is "rare and exceptional in character." If that were true, then every rare and exceptional substance found on somebody's property would be considered a "mineral." Instead, for purposes of property transfers, the *Heinatz* test turns on the "ordinary and natural meaning" of "mineral." *Dyegard Land P'ship v. Hoover*, 39 S.W.3d 300, 310 (Tex. App. 2001).

13

Whether a material is "rare and exceptional" assists the determination of whether it is included in the ordinary and natural meaning of "mineral." For example, as in *Heinatz*, limestone could be a mineral if it could be profitably used in making cement, but it is not a mineral if the limestone can only be used for building purposes. 217 S.W.2d at 997. Sand is also not generally a mineral, but it could be if it had special properties that made it valuable for making glass. *Id.* Similarly, sandstone and scoria could fall into the ordinary definition of mineral, but for purposes of a mineral deed they do not because they do not possess any special properties that make them rare and exceptional. *Farley*, 890 P.2d at 380; *Hart*, 216 P.3d at 198. When a material may fit into the "ordinary and natural meaning" of "mineral," such as limestone and sand, any rare and valuable characteristics inform the inquiry into whether a material fits the definition. However, not all rare and valuable materials fit the ordinary and natural meaning of mineral.

The second takeaway is a material's inclusion in the scientific definition of "mineral" is not determinative. *Heinatz*, S.W.2d at 997. If courts were to follow the technical definition of "mineral," "dirt composing a large part of the surface could also be considered a mineral." *Dyegard*, 39 S.W.3d at 310; *see also Fleming Found. v. Texaco, Inc.*, 337 S.W.2d 846, 851 (Tex. Civ. App. 1960) (Although there is no "doubt about water being technically a mineral," subsurface water is not

a mineral under a reservation of mineral rights). Thus, the Court does not need to involve itself in the dispute as to whether francolite is properly classified as a mineral. Similarly, the presence of the mineral hydroxylapatite is not determinative. As discussed above, bones and teeth of living and dead vertebrates naturally contain hyrdoxylapatite. (*Raymond Rogers Ex. Disclosure at 6*, Doc. 48-4 at 199.) Yet a reasonable person would not believe that the remains of a mule deer found on the Murrays' ranch that contain either francolite or hydroxylapatite would fit the ordinary definition of "mineral" under a mineral deed.

Accordingly, the Court's task is not simply to determine whether the dinosaur fossils are "rare and exceptional in character." The Court uses the fossils' characteristics to help inform the analysis of whether they meet the ordinary and natural meaning of "mineral." The Court looks to several sources in aid of that determination. Deeds conveying an interest in property are governed by contract principals. *Mary J. Baker Revocable Trust v. Cenex Harvest States, Cooperatives, Inc.*, 164 P.3d 851, 857 (Mont. 2007) (citing Mont. Code Ann. § 70-1-513). Montana courts use dictionary definitions to assist in determining the common and ordinary understanding of a contract term. *Dollar Plus Stores, Inc. v. R-Montana Associates, L.P.*, 209 P.3d 216, 219 (Mont. 2009); *Ravalli Cty. v. Erickson*, 85 P.3d 772, 774 (Mont. 2004).

The relevant dictionary definitions of "mineral" typically include an inorganic element or compound mined for economic purposes. *See Webster's Third New International Dictionary* 1437 (Philip Babcock Gove ed. 1981) (defining "mineral," in part, as "a solid homogenous crystalline chemical element or compound (as diamond or quartz) that results from inorganic processes of nature and that has a characteristic crystal structure and chemical composition or range of compositions; any of various naturally occurring homogenous or apparently homogenous and usu[ally] but not necessarily solid substances...obtained for man's use usu[ally] from the ground"); *New Oxford American Dictionary* 1113 (Angus Stevenson & Christine Lindberg eds., 3rd ed. 2010) ("a solid inorganic substance of natural occurrence; substance obtained by mining"); and *The American Heritage Dictionary* 1120-21 (Joseph Pickett ed., 5th ed. 2011) ("A naturally occurring, homogenous inorganic solid substance having a definite chemical composition and characteristic crystalline structure, color, and hardness; Any of the various natural substances, as: a. An element, such as gold or silver. b. An organic derivative, such as coal or petroleum. c. A substance, such as stone, sand, salt, or coal, that is extracted or obtained from the ground or water and used in economic activities"). Finally, the latest edition of Black's Law Dictionary defines "mineral" as:

> **1.** Any natural inorganic matter that has a definite chemical composition and specific physical properties that give it value <most

16

minerals are crystalline solids>. **2.** A subsurface material that is explored for, mined, and exploited for its useful properties and commercial value. **3.** Any natural material that is defined as a mineral by statute or caselaw.

*Black's Law Dictionary* 1145 (Bryan Garner ed., 10th ed. 2014).

In addition to dictionaries, Montana courts may look to statutory definitions from other contexts to help determine the common and ordinary understanding of a contract term. *Dollar Plus Stores*, 209 P.3d at 219-20. Cited earlier, Mont. Code Ann. § 82-4-303(16) provides:

"Mineral" means any ore, rock, or substance, other than oil, gas, bentonite, clay, coal, sand, gravel, peat, soil materials, or uranium, that is taken from below the surface or from the surface of the earth for the purpose of milling, concentration, refinement, smelting, manufacturing, or other subsequent use or processing or for stockpiling for future use, refinement, or smelting.

Under Montana's tax code, "mineral" is defined as

[A]ny precious stones or gems, gold, silver, copper, coal, lead, petroleum, natural gas, oil, uranium, talc, vermiculite, limestone, or other nonrenewable merchantable products extracted from the surface or subsurface of the state of Montana.

Mont. Code Ann. § 15-38-103.

The above statutory definitions of "mineral" focus on the mining of hard substances or oil and gas that are primarily extracted for future refinement and economic purposes. Dinosaur fossils do not seemingly fall into those statutory definitions. Montana law draws distinctions between minerals and fossils in other

places. In the context of leasing state land, regulation differentiates fossil

collection and mineral exploration:

> "General recreational use" means non-concentrated, non-commercial recreational activity, except:
>
>> (a) collection, disturbance, alteration, or removal of archeological, historical, or paleontological sites or specimens (e.g., fossils, dinosaur bones, arrowheads, old buildings, including siding) (which requires an antiquities permit pursuant to 22-3-432, MCA);
>>
>> (b) mineral exploration, development, or mining (which requires a lease or license pursuant to Title 77, chapter 3, MCA);
>>
>> (c) collection of valuable rocks or minerals (which requires a lease or license pursuant to Title 77, chapter 3, MCA)[.]

Mont. Admin. R. 36.25.145(11). Further, the legislature differentiated between

fossils and minerals by granting the Montana Historical Society the authority "to

collect and preserve such natural history objects as fossils, plants, minerals, and

animals[.]" Mont. Code Ann. § 22-3-107(13).

The Seversons challenge the use of unrelated statutory definitions to assist in

determining the meaning of the term "mineral" as used in their mineral deed. The

Seversons point out that the Montana Supreme Court in *Farley* considered but

ultimately did not rely on the statutory definitions of "mineral." Instead, the

Seversons urge this Court to only consider whether the fossils are "rare and

exceptional."

18

The Court agrees that the statutory definitions are used in different contexts and cannot be used as the sole legal authority to determine whether a material is a "mineral" for purposes of a land transfer. However, the Court can use these definitions to assist in the determination of whether dinosaur fossils are included in the ordinary and natural meaning of "mineral." Montana law permits the use of both dictionary and statutory definitions to determine the ordinary and common meaning of an agreement's term. *Dollar Plus Stores*, 209 P.3d at 219-20; *see also Newman v. Wittmer*, 917 P.2d 926, 930 (Mont. 1996) ("statutory definitions provide guidance in interpreting the ordinary and popular meaning of undefined terms in a restrictive covenant"). Further, *Farley* is distinguishable because one statutory definition of "mineral" explicitly included scoria, while it was unclear whether scoria was included in another statutory definition. *Farley*, 890 P.2d at 379. Because of this inconsistency, the statutory definitions were unhelpful. *Id.* As relating to fossils, the Court finds that the statutory and dictionary definitions of "mineral" are consistent; all of them exclude fossils from the definition of "mineral."

The Court finds that dinosaur fossils are not included in the natural and ordinary meaning of "mineral" as used in the Seversons' and Murrays' mineral deed. The above cited dictionary and statutory definitions show that the common understanding of "mineral" includes the mining of a hard compound or oil and gas

19

for refinement and economic exploitation. In contrast, dinosaur fossils are the remains of once-living vertebrates. The fossils' properties are not what make them valuable. Fossils are not subject to further refinement before becoming economically exploitable. Instead, the fossils are valuable because of their very existence. Dinosaur bones are not economically valuable to be processed into fuel or materials or manufactured into jewelry. Further, dinosaur fossils are not mined in the traditional sense, but rather discovered by happenstance. (Doc. 53 at 19.)

The Court finds that dinosaur fossils do not meet the ordinary and natural definition of "mineral" for purposes of a mineral deed, even though the fossils found on the Murrays' ranch could be described as "rare and exceptional." As discussed above, a material's status as "rare and exceptional" helps inform whether it is ordinarily considered a mineral. The test is not solely whether the material is rare and exceptional, however. Not all materials that are rare and exceptional are considered minerals. Here, the Court finds that both valuable dinosaur fossils, such as the Dueling Dinosaurs, and worthless fossils, like "junkasaur," are not ordinarily considered minerals. The Dueling Dinosaurs and "junkasaur" are likely composed of the same minerals. The composition of minerals found in the fossils does not make them valuable or worthless. Instead, the value turns on characteristics other than mineral composition, such as the completeness of the specimen, the species of dinosaur, and how well it is preserved.

If the test is truly whether a material is rare and exceptional, then many items that ordinarily would not be considered minerals would fall under a mineral deed. Although the Dueling Dinosaurs, the Murray T. Rex, and the Triceratops fossils are indisputably valuable, they do not fall under the ordinary and natural definition of "mineral" for purposes of a mineral deed.

## IV. Conclusion

The Court finds that dinosaur fossils are not minerals under a general mineral deed. Accordingly, IT IS HEREBY ORDERED:

1. The Murrays' Motion for Summary Judgment (Doc. 45) is GRANTED.

2. The Seversons' Motion for Summary Judgment (Doc. 48) is DENIED.

3. The Murrays are the sole owners of the dinosaur fossils found on the subject property.

4. The Clerk of Court shall enter judgment and close this case.

DATED this 30th day of May, 2016.

Susan P. Watters

SUSAN P. WATTERS
United States District Judge